USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 8/16/2012

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------- x
DENNIS J BUCKLEY, AS TRUSTEE OF THE :
DVI LIQUIDATING TRUST, :
: 06 Civ. 3291 (SHS)
            Plaintiff, :
: OPINION
      -against- :
:
DELOITTE & TOUCHE USA LLP and :
DELOITTE & TOUCHE LLP, :
:
            Defendants. :
---------------------------------------------------------------- x

SIDNEY H. STEIN, U.S. District Judge.

This tort and contract action arises out of the auditing work done by Deloitte & Touche USA LLP and Deloitte & Touche LLP (collectively, "Deloitte") on behalf of DVI, Inc, a defunct health care finance company. Dennis J. Buckley, DVI's bankruptcy trustee, asserts that Deloitte's conduct caused DVI's collapse. Deloitte has now moved for summary judgment in its favor and has also moved to exclude the expert report of Michael J. Epstein. The Court excludes that report because it lacks the factual foundation and reliable methodology that make opinion testimony useful to a jury. Further, because Buckley has failed to come forward with any admissible evidence upon which a jury could find that Deloitte caused DVI's injuries, the Court grants summary judgment in Deloitte's favor.

## I. Background

### A. The parties

DVI was a specialty finance company that primarily served healthcare providers. (Pl.'s Additional 56.1 ¶ 4; Defs.' Response 56.1 ¶ 4.)[1] As of June 30, 2002, DVI's management consisted of one president and seven vice

---

[1] Deloitte has filed a Local Civil Rule 56.1 Statement of Undisputed Facts ("Defs.' 56.1"). Buckley has filed a responsive Local Civil Rule 56.1 Statement of Undisputed Facts ("Pl.'s 56.1"), as well as a Statement of Additional Material Facts ("Pl.'s Additional 56.1"). Deloitte has filed a Response to Plaintiff's Statement of Additional Material Facts ("Defs.' Response 56.1").

presidents. Michael A. O'Hanlon served as CEO and Chairman of DVI and Steven R. Garfinkel served as Executive Vice President and Chief Financial Officer. (2002 DVI Form 10-K at 15, Ex. 32 to Pl.'s 56.1.) O'Hanlon, Gerald L. Cohn, William S. Goldberg, John E. McHugh, Harry T.J. Roberts, and Nathan Shapiro all served as directors during the 1999-2003 period. (*See* Exs. 29-31 to Pl.'s 56.1.)

Deloitte served as DVI's independent auditor. (Deloitte Engagement Letters, Exs. 60-63 to Defs.' 56.1.) It audited and signed-off on DVI's financial statements for the years ending June 30, 1999 through June 30, 2002. (1999-2002 DVI Forms 10-K, Exs. 1-4 to Defs.' 56.1.) Deloitte did not sign-off on any audit of DVI's financials following the June 30, 2002 Form 10-K. (*See* Pl.'s 56.1 ¶ 3; Defs.' 56.1 ¶ 3.)[2] None of the DVI financial statements audited by Deloitte were ever restated. (Pl.'s 56.1 ¶ 30; Defs.' 56.1 ¶ 30.)

Deloitte terminated its relationship with DVI on June 2, 2003. On that day, Garfinkel filed a Form 8-K on behalf of DVI, stating that Deloitte had resigned over a "disagreement" about "the status" of Deloitte's review for DVI's May 2003 Form 10-Q. (June 2, 2003 DVI Form 8-K at 2, Ex. 25 to Defs.' 56.1.) The "dispute" was allegedly over whether or not Deloitte's review was "complete." (*Id; see* Deloitte Letter to SEC dated June 17, 2003, Ex. 75 to Defs.' 56.1.)

### B. DVI's business

DVI's core business was extending loans and originating leases to healthcare providers to finance their purchases of such medical equipment as MRI and CT machines. (Pl.'s Additional 56.1 ¶ 4; Defs.' Response 56.1 ¶ 4; Dep. of Michael A. O'Hanlon dated Jan. 28, 2008 at 51:10-15, Ex. 22 to Pl.'s 56.1 and Exs. 20 & 87 to Defs.' 56.1.) DVI's equipment contracts were typically "structured as notes secured by equipment or direct financing leases with a bargain purchase option." (2000 DVI Form 10-K at 2, Ex. 30 to Pl.'s 56.1.)

DVI operated its business of equipment purchase loans primarily through a subsidiary, DVI Financial Services, Inc. (Pl.'s Additional 56.1 ¶ 4; Defs.' Response 56.1 ¶ 4.) DVI also provided "lines of credit for working capital financing secured by receivables through a second operating

---

[2] Each party purports to dispute most "facts" included in the opposing party's Local Civil Rule 56.1 statement, including this one. Nonetheless, except where noted, the facts cited here are not genuinely disputed because the opposing party cannot point to contrary admissible evidence. *See* Fed. R. Civ. P. 56(c), 56(e)(2).

2

subsidiary, DVI Business Credit Corporation." (Pl.'s Additional 56.1 ¶ 5; Defs.' Response 56.1 ¶ 5.)

DVI's business model required that it both extend loans and obtain them: DVI stated in its public filings that its "cash flows from operations are insufficient" to fund its loan origination work during periods of "high growth." (*E.g.*, 1999 DVI Form 10-K at 10, Ex. 1 to Defs.' 56.1.) DVI required "substantial amounts of external funding" (2002 DVI Form 10-K at 11, Ex. 4 to Defs.' 56.1), and "[i]f DVI had no access to securitizations or to funds from its lenders, DVI would have been unable to make loans." (Pl.'s 56.1 ¶ 116; Defs.' 56.1 ¶ 116.)

### C. Credit facilities and borrowing base reports

DVI obtained initial funding for "most of [its] equipment contracts" through interim warehouse lines of credit provided by a syndicate led by Fleet National Bank and by other financial institutions, including Merrill Lynch. (2002 DVI Form 10-K at 9; Pl.'s Additional 56.1 ¶ 7; Defs.' Response 56.1 ¶ 7.) The source of funds for DVI's repayment of its warehouse borrowings was primarily the proceeds of securitizations and the sales of its leases. (Pl.'s Additional 56.1 ¶ 8; Defs.' Response 56.1 ¶ 8.)

DVI's revolving credit limit with Fleet (and Merrill) was tied to a "borrowing base" amount. The "borrowing base" constituted a certain percentage of DVI's assets, such as contract receivables and equipment, that could be pledged as collateral. (*E.g.*, Fleet Fourth Amended and Restated Loan Agreement § 1.2, Ex. 116 to Pl.'s 56.1; *see* Pl.'s 56.1 ¶ 22; Defs.' 56.1 ¶ 22.) To substantiate its borrowing authority, DVI had to provide Fleet with monthly "borrowing base reports." (Fleet Agreement § 5.8.) These reports documented DVI's collateral. DVI expected Fleet to "terminate" its line of credit with DVI if it discovered that "DVI no longer had a sufficient amount of eligible loans to support" its credit authority. (*See* Report of Harris L. Devor dated Sept. 2, 2008 ("Devor Report") ¶ 230, Ex. 4 to Pls.' 56.1; Pl.'s 56.1 ¶ 97; Defs.' 56.1 ¶ 97.)

### D. DVI's loan loss reserve

The risk to DVI's stream of income from borrowers' repayment of interest and principal of loans was that borrowers would not repay their loans. To account for this risk on its books and records, DVI reported a loan loss reserve. (*E.g.*, 1999 DVI Form 10-K at 9, 33, Ex. 29 to Pl.'s 56.1.) The loan loss reserve represents "probable" losses to DVI that could be "reasonably estimated." *Accounting for Contingencies*, Statement of Financial Accounting

Standards No. 5 (Financial Accounting Standards Board 1975). DVI's stated method of calculating its loan loss reserve was to identify certain delinquent loans (usually those more than 90 days overdue), estimate the loss to DVI, and then report the total. (*See* Devor Report ¶ 58; Aff. of Steven R. Garfinkel dated March 26, 2007 ("Garfinkel Aff.") ¶ 93, Ex. 103 to Pl.'s 56.1.) The parties dispute how DVI actually arrived at its loan loss reserve.

### E. DVI's collapse

Despite its various borrowing agreements, DVI faced "liquidity issues." (Pl.'s 56.1 ¶ 17; Defs.' 56.1 ¶ 17.) These issues resulted, at least in part, from international operations that were "draining cash out of the DVI enterprise." (Pl.'s 56.1 ¶ 17; Defs.' 56.1 ¶ 17; Dep. of Michael J. Epstein dated Feb. 17, 2009 at 410:2-5, Exs. 13 & 84 to Defs.' 56.1 and Ex. 21 to Pl.'s 56.1.)

Although the parties do not dispute that DVI faced liquidity constraints, they vigorously dispute whether or not its Board recognized the scope of the problem. (*See* Pl.'s 56.1 ¶¶ 18-20; Defs.' 56.1 ¶¶ 18-20.) Two former directors, Goldberg and Shapiro, aver that the financial statements presented to the audit committee indicated that DVI "had adequate credit facilities and liquidity." (Decl. of William S. Goldberg dated Jan. 30, 2008 ("Goldberg Decl.") ¶ 4, Ex. 1 to Pl.'s 56.1; Decl. of Nathan Shapiro dated Feb. 5, 2008 ("Shapiro Decl.") ¶ 3, Ex. 2 to Pl.'s 56.1.) Whether or not Goldberg and Shapiro believed those statements, it is undisputed that Garfinkel, DVI's CFO, did not. In fact, Garfinkel believed that "DVI was chronically short of capital" and had been for years. (Garfinkel Aff. ¶¶ 55-61; *see* Ex. 1 to Garfinkel Aff. (describing DVI's August 1999 cash position as "strained" in a memorandum to O'Hanlon).)

In the fall of 2002, DVI's financial condition "materially worsened." (Garfinkel Aff. ¶ 110.) DVI expended some of its cash resources in an effort to free a valuable piece of collateral from bankruptcy proceedings. (*Id.*) At the time, DVI was out of compliance with its Fleet facility collateral requirements; Garfinkel thought that freeing the collateral "would have been sufficient to get DVI into compliance." (*Id.*) Before DVI could pledge that collateral to Fleet, however, DVI used it to purchase a series of delinquent loans from securitization in order to prevent those securities from defaulting. (*Id.* ¶¶ 111-12.) As a result, DVI continued to be "out of compliance under the Fleet facility by a large amount." (*Id.* ¶ 113.) Garfinkel elected to deal with this problem by pledging "up to $25 million" in *the same* loan receivables to both Merrill Lynch and Fleet. (*Id.* ¶ 113.) Garfinkel testified that he was attempting "to buy the company time to solve" its liquidity problems. (Dep.

of Steven R. Garfinkel dated March 25, 2008 at 1995:12-19, Ex. 16 to Defs.' 56.1; Pl.'s 56.1 ¶ 21; Defs.' 56.1 ¶ 21.)

In March 2003 Merrill directed the financial advisory firm Mackinac Partners "to conduct an audit of the collateral pledged to secure Merrill's warehouse loan facility." (Garfinkel Aff. ¶ 131.) During this audit, Merrill and its agents reviewed each loan pledged to Merrill under the loan agreement and frequently reduced the value of that loan for purposes of calculating the "borrowing base" for Merrill's loan to DVI. (*Id.* ¶¶ 132-33.) Next, Merrill "demanded" that DVI provide additional collateral to secure DVI's obligations. (*Id.* ¶ 133.) Then Merrill mandated that DVI "transfer most or all of [the] principal and collateral" DVI had pledged to Merrill to Merrill's off-balance sheet facility. (*Id.* ¶ 138.) Merrill then informed DVI that it "would not renew or further extend the warehouse facility." (*Id.* ¶ 139; *see* Buckley's Complaint against Merrill Lynch ¶¶ 110-13, Ex. 47 to Defs.' 56.1.) As a result, DVI found itself in "a dire liquidity situation." (Garfinkel Aff. ¶ 140.)

In July 2003 DVI negotiated with Goldman Sachs for potential "bridge and [debtor-in-possession] financing." (Garfinkel Aff. ¶ 166.) This financing would have enabled DVI to make a bond interest payment that was coming due August 1st. (O'Hanlon Dep. at 1526:12-19.)

That loan never materialized. During the due diligence phase of negotiations, Garfinkel informed a Goldman Sachs representative that "DVI was out of compliance on the Fleet warehouse loan" because it had pledged "$50 million of ineligible collateral on the Fleet borrowing base." (Garfinkel Aff. ¶ 166; *see* O'Hanlon Dep. at 1526:02-11.) Indeed, Garfinkel had falsified a "borrowing base report submitted to DVI's lenders in July 2003" and signed "a false certification to the March 31, 2003 financial statements" after Deloitte's last audit. (Pl.'s 56.1 ¶ 29; Defs.' 56.1 ¶ 29.) Goldman Sachs suspended negotiations with DVI. (Garfinkel Aff. ¶¶ 166.)

Following the Goldman Sachs meeting, a DVI executive informed Fleet that "there was a shortfall in their collateral." (Dep. of Harry T. J. Roberts dated Dec. 5, 2007 at 574:05-15, Ex. 19 to Defs.' 56.1; Garfinkel Aff. ¶ 167 ("[I]t is my understanding that when O'Hanlon met with Fleet he was vague about everything except that there was a problem with collateral.") Fleet denied DVI's request to waive this problem and began an audit of the warehouse loan and DVI's collateral. (Garfinkel Aff. ¶ 167; *see* O'Hanlon Dep. at 1527:06-08.) Fleet also froze DVI's accounts. (Pl.'s 56.1 ¶¶ 22-23; Defs.' 56.1 ¶¶ 22-23.) Fleet's actions further diminished DVI's liquidity and imperiled its August 1st interest payment for its "9 7/8 percentage notes due 2004." (*See* Roberts Dep. at 726:06-727: 20.)

DVI next attempted to secure a loan from an affiliate of Cerberus, a private equity firm. (DVI Board Minutes dated Aug. 1, 2003, Ex. 36 to Defs.' 56.1.) "[O]ne of the permitted and intended uses of this twenty million dollar commitment [was] to pay the bond interest that was due on August 1st, 2003." (O'Hanlon Dep. at 1537:13-23.) Cerberus insisted that DVI obtain a waiver from Fleet and the other syndicate lenders before extending the loan. (Ex. 36 to Defs.' 56.1.) Fleet refused: it told O'Hanlon that it was "not interested in allowing anyone access to any collateral other than themselves." (O'Hanlon Dep. at 1539:18-22; Ex. 36 to Defs.' 56.1.) The Cerberus loan fell through.

DVI failed to make its August 1, 2003 interest payment on its bonds. (*See* Pl.'s 56.1 ¶ 24; Defs.' 56.1 ¶ 24.) DVI filed for bankruptcy on August 25, 2003. (Pl.'s 56.1 ¶ 27; Defs.' 56.1 ¶ 27.) Buckley admits in this litigation that the "defaults under the indenture governing the Notes and the resulting cross-defaults under DVI's other loan and credit agreements" could be considered "an immediate precipitating factor of DVI's bankruptcy." (*See* Pl.'s Supplemental Responses to Defs.' Requests for Admission dated Sept. 16, 2008, Ex. 45 to Defs.' 56.1.) DVI's CEO testified that "[b]y simply paying the bonds, [DVI] would have avoided a default and then all the cross default consequences that a default on the bonds caused." (O'Hanlon Dep. at 1538:20-1539:5.)

### F.  DVI and its affiliates file for bankruptcy and initiate this action.

DVI and its affiliates filed for bankruptcy on August 25, 2003. (Pl.'s 56.1 ¶ 27; Defs.' 56.1 ¶ 27.) Buckley, as Trustee for the DVI Liquidating Trust, filed an initial complaint in this action on April 28, 2006 and an amended complaint ("Complaint") on May 1, 2009.[3] The Complaint asserts professional malpractice, negligent misrepresentation, breach of contract, and aiding and abetting breach of fiduciary duty claims. On April 30, 2010, Buckley withdrew its aiding and abetting breach of fiduciary duty claim. Buckley's remaining claims allege that Deloitte's allegedly negligent auditing—particularly with respect to DVI's loan loss reserve—caused the "financial death spiral" that forced DVI into bankruptcy. (Compl. ¶ 1; Pl.'s Mem. Opp. to Summary Judgment ("Pl.'s Opp.") 23.)

---

[3] On May 22, 2007, the Court dismissed the aiding and abetting fraud claim asserted in the original complaint. *Buckley ex rel. DVI Liquidating Trust v. Deloitte & Touche USA LLP*, No. 06 Civ. 3291, 2007 WL 1491403 (S.D.N.Y. May 22, 2007)(Dkt. No. 29). Buckley's amended complaint deleted his earlier claims of fraud and deepening insolvency. (Dkt. No. 80.)

Deloitte has now moved for summary judgment in its favor (Dkt. No. 86) and also has moved to exclude the expert opinion of Michael J. Epstein submitted by Buckley in conjunction with its motion for summary judgment (Dkt. No. 85).

## II. Standing

Buckley, as DVI's trustee, has standing to assert claims that belonged to DVI, but not DVI's creditors. *See Caplin v. Marine Midland Grace Trust Co.*, 406 U.S. 416, 434 (1972). Deloitte contends that Buckley's action really seeks recovery for DVI creditors, not DVI, and that he therefore lacks standing.

As trustee, Buckley may assert claims that DVI could have asserted prior to bankruptcy. *Hirsch v. Arthur Andersen & Co.*, 72 F.3d 1085, 1093 (2d Cir. 1995). Buckley has alleged that Deloitte breached professional and contractual duties to DVI. "Whether the rights belong to the debtor or the individual creditors is a question of state law." *Id.*

This Court has already determined that Buckley's remaining causes of action may proceed against Deloitte under Pennsylvania law. *See Buckley ex rel. DVI Liquidating Trust v. Deloitte & Touche USA LLP*, No. 06 Civ. 3291, 2007 WL 1491403, at *10 (S.D.N.Y. May 22, 2007). Deloitte does not suggest on this motion that Buckley may not assert these claims. Deloitte instead focuses on the fact that one of DVI's experts measured damages, in part, by identifying outstanding obligations to its creditors. (Defs.' Mem. 27-28.) Buckley, needless to note, cannot recover DVI's creditors' damages. *See Caplin*, 406 U.S. at 434. But Buckley has alleged that Deloitte's breaches of duty damaged DVI by diminishing its equity value and customer base. (*E.g.*, Compl. ¶¶ 166-168.) Those are harms to DVI. *See Marion v. TDI Inc.*, 591 F.3d 137, 149 (3d Cir. 2010). Accordingly, Buckley has standing to seek relief in this action. Deloitte's objection to the method of damages calculation is a separate issue and not a matter of standing. *See id.*

## III. Motion to exclude

### A. The Epstein Report is not admissible evidence of what would have happened if Deloitte's audit had reported inaccuracies in the loan-loss reserve ratio.

#### 1. *The admissibility of expert opinion evidence is governed by Federal Rule of Evidence 702.*

Expert witnesses, unlike lay witnesses, are "permitted wide latitude to offer opinions, including those that are not based on firsthand knowledge or observation." *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 592 (1993). That latitude is bounded by Rule 702, which governs whether a witness is an expert and whether his or her opinions are admissible as expert opinion evidence, and reads as follows:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. This rule applies not only to testimony based on "scientific" knowledge, but also to testimony based on "technical" or "other specialized knowledge." *See id.*; *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141 (1999).

"Under *Daubert*, the district court functions as the gatekeeper for expert testimony, whether proffered at trial or in connection with a motion for summary judgment." *Major League Baseball Props., Inc. v. Salvino*, 542 F.3d 290, 310 (2d Cir. 2008) (citations and quotation marks omitted). "[E]xpert testimony should be excluded if it is speculative or conjectural." *Boucher v. U.S. Suzuki Motor Corp.*, 73 F.3d 18, 21 (2d Cir. 1996). Expert opinions that are "without factual basis and are based on speculation or conjecture are similarly inappropriate material for consideration on a motion for summary judgment." *Major League Baseball*, 542 F.3d at 311 (citing *Raskin v. Wyatt Co.*, 125 F.3d 55, 66 (2d Cir. 1997) ("[A]n expert's report is not a talisman against summary judgment.")). The same is true of conclusory opinions. *Major*

*League Baseball*, 542 F.3d at 311 (citing *Bridgeway Corp. v. Citibank*, 201 F.3d 134, 142 (2d Cir. 2000)). The "[a]dmission of expert testimony based on speculative assumptions is an abuse of discretion." *Boucher*, 73 F.3d at 22.

### 2. *Buckley offers Epstein's opinions to show the DVI that could have been.*

Buckley offers the expert report of Michael J. Epstein, principally on the issue of causation. Epstein, a veteran restructuring professional, submitted a report opining on (1) "the appropriate course of action that the company and its Board of Directors . . . *should have taken*" and (2) what the "financial condition of the company *could have been*" had Deloitte not breached its duties. (Expert Report of Michael J. Epstein dated Sept. 4, 2008 ("Epstein Report") ¶¶ 3-4, Ex. 5 to Pl.'s 56.1 (emphasis added).) As Buckley presents the evidence, "Epstein determined with reasonable certainty that, *if* Deloitte had disclosed to the Board and others DVI's true financial condition[,] . . . DVI's Board *would have* restructured the company to focus on its core and most profitable businesses." (Pl.'s Opp. 21 (emphasis added).)

Epstein actually analyzed DVI's hypothetical response to the discovery of the loan loss reserve issue on each of four "breach dates": the dates DVI filed its audited financial statements, which Buckley contends were not in accordance with GAAP. Epstein focused in particular on what would have happened if Deloitte had reported that DVI had "materially understated" its loan loss reserve. (Epstein Report ¶¶ 5, 8.) Epstein concluded that, had Deloitte correctly reported that DVI's loan loss reserve was materially understated on August 6, 1999, August 18, 2000, or August 10, 2002, DVI would have adopted restructuring plans, those plans would have succeeded, and DVI would have continued as a going concern. (*See* Epstein Report ¶¶ 3-5, 11-22.) For the fourth date, October 11, 2002, Epstein concluded that DVI was "probably too weak to be able to effectuate a successful restructuring"; instead, Epstein speculates, DVI could have been liquated at a value sufficient to satisfy all "domestic secured creditors" and produce $184 million for "domestic unsecured creditors." (Epstein Report ¶¶ 23-26.)

### 3. *Epstein's opinion is neither supported by facts nor reliable.*

The Epstein opinion relies on unfounded assumptions about what DVI's Board and lenders would have done if certain hypothetical events took place. Even though Epstein appears qualified by his experience to opine on restructuring issues, his report must be excluded for lack of sufficient factual foundation and for want of reliable methodology.

9

a. *Epstein speculates that DVI's Board would have restructured or liquidated DVI.*

Epstein fails to provide "sufficient factual foundation" to support his conclusion that the Board would, in fact, have adopted his proposals. *See Boucher*, 73 F.3d at 22. Instead, he improperly relies on conjecture. *See Major League Baseball*, 542 F.3d at 311.

Epstein can only surmise, estimate, guess, or conjecture what the Board would have done because he has no factual foundation from which to draw. For example, Epstein's report provides no analysis of the past behavior of DVI's Board, no assessment of individual Board members' preferences, and no interviews or other evidence that might constitute, or even suggest a factual predicate for his conclusion. (*See* Epstein Report ¶¶ 27-32 ("Overall Methodology").) Though his report identifies the depositions of Cohn, Shapiro, Roberts, Garfinkel, and O'Hanlon as "source data," (Ex. II to Epstein Report), it does not indicate that any of those witnesses commented on any restructuring proposal. In fact, he admits they did not. Epstein "never presented any of the proposed restructurings or liquidations" to any former member of DVI's Board or management. (Epstein Dep. at 314:05-12.) The truth of Epstein's conclusion—that the Board would have adopted any of Epstein's plans—is that it is not a conclusion at all; it is, as Buckley admits, a "premise." (Pl.'s Opp. to Defs.' Motion to Exclude Epstein Report 7.) Epstein's "premise," however, is not admissible as opinion evidence. Nor, therefore, are the unsupported predictions that follow from that premise.

Epstein's opinion that the Board would have adopted his proposals also lacks the benefit of a tested or testable methodology. Epstein reports no factors that he considered when evaluating the likelihood of the Board approving his proposal or even what methodology he employed. Whatever leeway Rule 702 permits, it certainly requires more rigor than this. *Nimely v. City of New York*, 414 F.3d 381, 399 (2d Cir. 2005) (striking opinion for its "unverifiable subjectivity"); *24/7 Records, Inc. v. Sony Music Entm't, Inc.*, 514 F. Supp. 2d 571, 575 (S.D.N.Y. 2007) (rejecting expert methodology as unreliable when "[i]t cannot be tested, it has no known rate of error, and it is not subject to any particular standards or controls."); *see Daubert*, 509 U.S. at 593–94.

b. *Epstein speculates that DVI's lenders would have supported restructuring DVI.*

Epstein's opinion with respect to DVI's lenders is also inadmissible as speculation. He concludes that DVI's lenders "would have pressed for corrective action to be taken" with an "emphasis on restructuring options

10

available to DVI." (Epstein Report ¶ 8.) He further concludes that his "restructuring actions would have been sufficient to provide [DVI's lenders] with comfort" and would have "brought the Fleet Bank borrowing base into compliance by March 31st of each respective breach year," so Fleet would have "supported" the restricting plan. (*Id.* ¶¶ 86-90.)

Epstein reaches his conclusion independent of the actual facts. Epstein did not provide any industry data on how lenders react to negative borrower disclosures. (*See* Epstein Dep. at 367:13-25.) Nor did he provide specific evidence regarding the lenders here: Epstein did not present his restructuring plan to anyone from Fleet (*id.* at 359:14-17); he did not interview or talk to anyone from Fleet "with respect to what they would have done had they been presented with the loan loss reserves identified by Harris Devor," (*id.* at 359:19-24); and he did not gauge the lenders' reaction to his restructuring proposals, (*id.* at 362:03-14). Indeed, he never reviewed the loan documents to analyze whether DVI would have been in breach of its covenants, (*id.* at 381:03-382:07). Rather, he relied on his experience for the proposition that "lenders require swift action be taken to rectify the situation." (Epstein Report ¶ 88.) But generalized experience alone does not show that Epstein used "sufficient facts or data" and employed "reliable principles and methods" to determine how this particular set of financial institutions would respond to a significant business event. *See* Fed. R. Evid. 702.

At bottom, Epstein's report tells a Panglossian tale of the DVI that might have been. In the telling, however, Epstein neglects the factual underpinnings and reliable methodology that make opinion testimony useful to the jury. Because the opinion evidence about what DVI's Board and DVI's lenders would do "is connected to existing data only by the *ipse dixit* of the expert," this Court concludes "that there is simply too great an analytical gap between the data and the opinion proffered" for Epstein's opinions to be admissible. *General Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).

## IV. Summary Judgment Motion

### A. Summary judgment standard

Summary judgment is appropriate only when the evidence shows that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). In determining whether a genuine dispute of material fact exists, the Court "the court must resolve all ambiguities and

11

draw all justifiable factual inferences in favor of the party against whom summary judgment is sought." *Major League Baseball Properties, Inc. v. Salvino, Inc.*, 542 F.3d 290, 309 (2d Cir. 2008). Nonetheless, the party opposing summary judgment "may not rely on mere conclusory allegations nor speculation, but instead must offer some hard evidence" in support of its factual assertions. *D'Amico v. City of New York*, 132 F.3d 145, 149 (2d Cir. 1998); *Self v. Dep't of Educ. of the City of New York*, 844 F. Supp. 2d 428, 434 (S.D.N.Y. 2012).

### B. Negligence

#### 1. *Elements of negligence actions*

Pursuant to Pennsylvania law,[4] breaches of professional duties constitute actions for negligence sounding in tort. *In re CitX Corp., Inc.*, No. 03 Civ. 6766, 2005 WL 1388963 (E.D. Pa. June 7, 2005), *aff'd by* 448 F.3d 672 (3d Cir. 2006). To recover for negligence, a plaintiff must demonstrate "that the defendant owed a duty of care to the plaintiff, the defendant breached that duty, the breach resulted in injury to the plaintiff, and the plaintiff suffered an actual loss." *Martin v. Evans*, 711 A.2d 458, 461 (Pa. 2008). To recover for negligent misrepresentation, a plaintiff must prove (1) a misrepresentation of a material fact; (2) made under circumstances in which the misrepresenter ought to have known its falsity; (3) with an intent to induce another to act on it; (4) which results in injury to a party acting in justifiable reliance on the misrepresentation. *Bortz v. Noon*, 729 A.2d 555, 561 (Pa. 1999). Both torts require proof of causation.

"Proximate causation is defined as a wrongful act which was a substantial factor in bringing about the plaintiff's harm." *Eckroth v. Penn. Elec., Inc.*, 12 A.3d 422, 428 (Pa. Super. 2010). "Proximate cause does not exist where the defendant's negligence was so remote that the defendant cannot be held legally responsible as a matter of law for the harm done." *Holt v. Navarro*, 932 A.2d 915, 921 (Pa. Super. 2007). Thus, "when it appears to the court highly extraordinary that the actor's conduct should have brought about the harm," the court must "refuse to find an actor's conduct was the legal cause of harm." *Id.* (quoting *Brown v. Philadelphia Coll. of Osteopathic Med.*, 760 A.2d 863, 868 (Pa. Super. 2000)). In this way, proximate cause narrows the scope of liability from "one of the great number of events without which any happening would not have occurred" to the act or acts

---

[4] The parties have stipulated that Pennsylvania law governs the claims asserted here. (Stipulation ¶ 1, Dkt. No. 26.)

that would lead "reasonable" persons to regard as the cause of plaintiff's harm. *Ford v. Jeffries*, 379 A.2d 111, 114 (Pa. 1977).

"The defendant's negligent conduct may not, however, be found to be a substantial cause where the plaintiff's injury would have been sustained even in the absence of the actor's negligence." *Hamil v. Bashline*, 392 A.2d 1280, 1284 (Pa. 1978). Put another way, "but for" causation is a necessary, but not a sufficient, condition for liability. Restatement (Second) of Torts § 432(1).

Buckley contends that these standards are relaxed in professional negligence cases. He points to *In re CitX Corp.*, 448 F.3d 672, 678-80 (3d Cir. 2006), for the notion that "causation is satisfied" in an action against a company's professional advisers when "competent evidence is put forth to demonstrate that the company would have taken [certain] steps had the defendant not acted negligently." (Pl.'s Opp. 20.) But *CitX* does not articulate a novel standard of causation in professional negligence cases. Rather, the Third Circuit in *CitX* discounted a "sham affidavit" offered by a former COO to show what he might have done had he received different information than he actually had.[5] *CitX*, 448 F.3d at 679-80. Buckley's other authority, *Drabkin v. Alexander Grant & Co.*, also tilts against him. *See* 905 F.2d 453, 456-57 (D.C. Cir. 1990). In *Drabkin* the Court of Appeals overturned a jury verdict against an independent auditor for lack of evidence of causation. There, one former director's speculation about what he might have done differently had the auditor provided him with correct information did not suffice to demonstrate causation. *Id.* Neither authority suggests that Pennsylvania applies something other than the "substantial factor" test in auditor liability cases.

### 2. *Buckley has failed to provide evidence that a jury could use to find that Deloitte tortiously caused the harms alleged to have befallen DVI.*

Buckley attributes DVI's "financial death spiral" to Deloitte's conduct as DVI's auditor. (Compl. ¶ 1; Pl.'s Opp. 20-24.) Buckley's theory of causation rests on Deloitte's audit of DVI's loan loss reserves: if Deloitte had corrected DVI's understated loan loss reserve, he contends, DVI's Board would have formulated—and executed—a successful plan to rescue the company. (Pl.'s Opp. 21.) In the worst case scenario, DVI could have been liquidated for a higher value than achieved through its bankruptcy. (*Id.*)

---

[5] The Third Circuit noted that a "sham affidavit" is one offered by the affiant in an effort to manufacture a factual dispute as when the affidavit contradicts the affiant's own prior testimony.

13

A change to DVI's loan loss reserves would not, *ceteris paribus*, have directly changed DVI's fate. The parties do not dispute that "losses on receivables are non-cash items." (Report of Terry L. Musika dated Nov. 17, 2008 ("Musika Report") ¶ 98, Ex. 37 to Defs.' 56.1; Defs.' 56.1 ¶ 25; Pl.'s 56.1 ¶ 25 ("[W]hether loan loss reserves is a non-cash accounting entry is irrelevant.").) Correctly reported loan loss reserves would not have increased DVI's available cash (*cf.* Devor Report Ex. 5 (noting "balance sheet" adjustments for assets, not earnings)), and there is no reason to believe DVI would have been able to meet its August 1 bond obligation. (*Compare* Defs.' ¶¶ 56.1 26, 52 *with* Pl.'s 56.1 ¶¶ 26, 52 (not disputing fact, but arguing that Deloitte could have helped DVI avoid being in that position in the first place).) DVI would presumably still have collapsed into bankruptcy unless something else changed as well.

Buckley's response to this point is to postulate that the alteration of DVI's loan loss reserve would have been the first in a cascade of events that would have resulted in DVI's salvation. Those hypothetical events are as follows:



1. Deloitte informs Board that loan loss reserves are materially understated ⇨ 2. Board resolves to restructure and reorganize company ⇨ 3. Board develops and approves restructuring plan based on Epstein proposal ⇨ 4. Lenders approve restructuring plan ⇨ 5. DVI avoids bankruptcy

(*See* Pl.'s Opp. 23; Epstein Report ¶¶ 6, 8, 12, 90; *cf.* Epstein Report ¶¶ 23-26 (propounding similar chain for "liquidating plan").)

Buckley cannot reach a jury with this hypothetical causal chain. Buckley has not presented any admissible evidence that, had Deloitte determined that DVI had misstated its loss reserve, DVI would have avoided its "financial death spiral" or liquidated for a higher value. Indeed, as a matter of law, Buckley's causal chain is simply too attenuated to justify liability.

    a. *Buckley cannot demonstrate "but for" causation.*

Buckley's causal chain has three elementary flaws: (i) there is no evidence from which the jury could conclude that the Board would have restructured or liquidated DVI; (ii) there is no evidence from which the jury could conclude that the Board, if it decided to restructure DVI, would have followed Epstein's proposal; and (iii) there is no evidence from which the

jury could conclude that DVI's lenders would have supported the restructuring. Buckley has but conjecture to present to the jury.

> i. The jury has no evidence from which to conclude that the Board would have agreed to restructure or liquidate DVI.

The first link in Buckley's causal chain—that the Board would spring into action upon learning the truth about the adequacy of DVI's loss reserve—lacks support. Buckley's principal evidence of causation is Epstein. Epstein's opinion, however, is not admissible to prove what DVI's Board would have done. *See ante* Point III. Bereft of that conclusion, Epstein's report, at best, illustrates possible or potential Board actions. "Providing a list of actions that reasonable directors 'could have' or might have' taken, without more, simply restates the central question with respect to causation." *RSL Commc'ns PLC v. Bildirici*, 649 F. Supp. 2d 184, 218 (S.D.N.Y. 2009) (citation omitted).

Testimony from the Board itself does not fix this problem. For example, when asked about whether he would have investigated and corrected the loan loss reserve issue if Deloitte had raised it, independent director William S. Goldberg testified, "It's a speculation, but I can't foresee how I wouldn't have tried." (Dep. of William S. Goldberg dated Feb. 20, 2008 at 456:18-457:03, Ex. 26 to Pl.'s 56.1.) Gerald Cohn, another independent director, said much the same: had Deloitte "discovered that DVI's loan loss reserves were materially understated for any number of quarters, I would have done what I could have to see that DVI's reported earnings for all relevant periods were restated as necessary." (Aff. of Gerald Cohn dated June 1, 2009 ("Cohn Aff.") ¶ 7, Ex. 3 to Pl.'s 56.1.) These statements do not permit the further inference that the Board would have agreed to restructure DVI.

Buckley similarly has failed to present evidence from which the jury could conclude that the Board would have liquidated DVI. Buckley tips his hand on this point by citing to the same evidence to prove that the Board would have restructured DVI as to prove that it would have liquidated it. (*See* Pl.'s Additional 56.1 ¶¶ 66-67.) Moreover, the statements of DVI's leadership to the effect that they "had a strong record of taking decisive action" (*e.g.*, Shapiro Decl. ¶ 18), do not permit the jury to infer that the Board would have liquidated DVI any more than they would permit the jury to infer that the Board have restructured it. Indeed, the comments of the directors indicate that the "decisive action" they might have contemplated included "implementing cash controls, replacing management, initiating

15

independent investigations and reporting [their] findings to regulators." (Goldberg Decl. ¶ 26; Shapiro Decl. ¶ 17.) Missing from this list? Any suggestion that the directors would have liquidated DVI.

>   ii.   The record does not permit the conclusion that the Board would have adopted Epstein's restructuring proposal, if it had adopted any at all.

Buckley's second causal link—that the Board's restructuring plan would be the one Epstein has proposed—is based on false equivalency. For example, the Board had discussed selling its international operations since 2001. (*See* O'Hanlon Dep. at 175:22-176:06; Dep. of Nathan Shapiro dated Feb. 6, 2008 at 578:19-579:06, Ex. 23 to Pl.'s 56.1; Dep. of Gerald Cohn dated Feb. 12, 2008 at 324:06-18, Ex. 14 to Pl.'s 56.1.) Additionally, Cohen stated that in the summer of 2003 he tried to assess "what the total of [DVI's] severance" obligations would be if DVI fired many of its employees. (Cohn Dep. at 263:10-263:12.) From this evidence, Buckley contends that the fact-finder ought to be permitted to infer that DVI's Board would have adopted the totality of Epstein's proposal because the Board once considered one or two of its elements.

Epstein's proposals are much larger and more specific than just general support for exiting international operations or reducing headcount. Consider his first proposal:

- Focus DVI on four sub-business units (Retail, Business Credit, Strategic Partners Group, HQ) (Epstein Report ¶ 34)
- Wind-down or sell thirteen sub-business units (*Id.* ¶ 34)
- Exit all international operations "within the 90 day period ended March 31, 2000" (*Id.* ¶ 38(e))
- Reduce various "go forward" business expenses: headcount (5%); building costs (2.5%); equipment costs (5%); travel and entertainment expenses (10%); "other expenses" (5%) (*Id.* ¶ 43)
- Adjust loan loss reserve and add "quarterly specific unallocated allowance" (*Id.* ¶¶ 50, 54)

According to Epstein, the reorganization would amount to a 35% change in DVI's revenue base and a 37% change in DVI's assets. (*Id.* ¶ 35.) The jury cannot be permitted to conclude that the Board would have supported Epstein's proposal in its entirety from evidence that certain individual Board members favored exiting international operations.

The dearth of evidence on this point bears similarity to the facts of *Drabkin v. Alexander Grant & Co.*, where a bankruptcy company's trustee

16

attempted to hold the company's auditor liable for not alerting the company to financial problems at a "time when corrective action was still possible." 905 F.2d 453, 455 (D.C. Cir. 1990). The court concluded that one outside director's opinion that he "could have insisted" on reforms did not suffice to support a jury verdict on the issue of causation. *Id.* at 456. The same problems abound here, where Buckley's causal theory hinges on Board approval of a complex plan it had never seen, advancing reforms there is no evidence it would support.

                iii.      Buckley has no evidence that DVI's lenders would have agreed to restructure the company.

Buckley's next causal link—that DVI's lenders would approve the Board's restructuring proposal—has no purchase in the evidence. Buckley points to no evidence, apart from Epstein's conclusion, that DVI's lenders would have endorsed any restructuring. *See ante* Point III. The dearth of evidence on this point is fatal to Buckley's causation argument. As Epstein himself admits, DVI's survival "required the continued support of its warehouse lenders." (Epstein Report ¶ 87.) But a jury has no basis from the record—apart from speculation— to conclude that DVI would have been able to obtain waivers of its defaults from its lenders and averted catastrophe. Put another way, the jury has no evidence from which to conclude that, but for Deloitte's conduct, Fleet would have given DVI the waiver Fleet in fact refused to give.

In sum, there is no evidence in this lengthy record that DVI's Board or its lenders would have approved the sort of complex proposal advanced by Epstein. But "[a] party opposing summary judgment does not show the existence of a genuine issue of fact to be tried merely by making assertions that are conclusory or based on speculation." *Major League Baseball Properties, Inc. v. Salvino, Inc.*, 542 F.3d 290, 310 (2d Cir. 2008) (citation omitted). There is no basis here from which the jury could conclude that DVI would have avoided a "death spiral" if Deloitte had determined that DVI's loan loss reserves were materially understated.

        3.    *Buckley's causal chain falls short of proximate causation.*

Even if Buckley could demonstrate a genuine dispute regarding "but for" causation, his tort claims would still fail because he has not demonstrated that Deloitte's conduct, as alleged, amounted to a proximate cause of DVI's collapse.

First, between Deloitte's conduct (not raising alarm over DVI's loan loss reserve) and the resulting harm (DVI's bankruptcy) stand the acts of DVI's management, Board, and lenders. In 2003 alone, Merrill Lynch tightened its lending to DVI and eventually terminated it (Garfinkel Aff. ¶¶ 131-39), DVI attempted to negotiate a bridge loan and failed (Garfinkel Aff. ¶¶ 166; Ex. 36 to Defs.' 56.1), and one of DVI's largest lenders, Fleet, froze DVI's accounts and refused to grant it a waiver of its defaults (Pl.'s 56.1 ¶¶ 22-23; Defs.' 56.1 ¶¶ 22-23). The number and complexity of those forces suggest that the "injury would [not] have been foreseen by an ordinary person as the natural and probable outcome of the act complained of." *Holt v. Navarro*, 932 A.2d 915, 921 (Pa. Super. 2007).

Second, Deloitte did not "create a force or series of forces which are in continuous and active operation up to the time of the harm." *See* Restatement (Second) of Torts § 433. Buckley does not contend that Deloitte created the precarious business situation in which DVI operated. *Cf. Marion v. TDI Inc.*, 591 F.3d 137, 150 (3d Cir. 2010).

Third, Garfinkel's pledging of ineligible collateral to DVI's lenders further diminishes any causal relationship between Deloitte's conduct and DVI's collapse. Garfinkel's conduct was criminal. (*See* Guilty Plea Agreement in *United States v. Garfinkel*, No. 06 Cr. 640 (E.D. Pa. Dec. 12, 2006), Ex. 24 to Defs.' 56.1.) His criminal conduct was not a foreseeable consequence of Deloitte's auditing *See Liney v. Chestnut Motors, Inc.*, 218 A.2d 336, 337-338 (Pa. 1966) (holding that criminal's theft of car and subsequent reckless driving was unforeseeable to negligent garage). Moreover, the parties do not dispute that Garfinkel's conduct contributed to DVI's final collapse—upon discovering the "problem with the collateral," Fleet froze DVI's accounts and refused to waive its breaches and DVI tipped into bankruptcy within weeks. Under these conditions, Garfinkel's conduct constitutes a superseding cause of DVI's harm. *See id*; Restatement (Second) of Torts § 448.

The Court cannot agree with Buckley that the facts suggest that Deloitte should be held legally accountable for DVI's collapse. Although the record elucidates a dispute over Deloitte's conduct, the Court can neither say that Deloitte' conduct was "one of the great number of events without which [DVI's collapse] would not have occurred," nor that Deloitte's acts would lead "reasonable" persons to regard it as the cause of DVI's harm. *See Ford v. Jeffries*, 379 A.2d 111, 114 (Pa. 1977). Accordingly, Deloitte is entitled to summary judgment in its favor on Buckley's tort claims.

### C. Buckley has not presented any evidence to support his breach of contract theory.

#### 1. *No evidence connects DVI's collapse to Deloitte's alleged breach of contract.*

Buckley's contract claim fails for the same reasons that his tort claims do. In order to recover for damages for a breach of contract pursuant to Pennsylvania law, Buckley "must show a causal connection between the breach and the loss." *Logan v. Mirror Printing Co.*, 600 A.2d 225, 226 (Pa. Super. 1991). As discussed above, there is no record evidence of a causal connection between the alleged harm—"DVI's financial death spiral"—and Deloitte's auditing.[6] If Buckley has some other damages theory for its breach of contract claim, he has not advanced it.

#### 2. *Buckley's other breach of contract theories lack evidentiary support.*

Buckley also contends that he may proceed to trial because of Deloitte's breach of contract by "withdrawal." (Pl.'s Opp. 49.) Though this claim is not an impermissible professional standards claim, *Buckley*, 2007 WL 1491403, at *11, it nevertheless fails for lack of evidence. Among other defects, such as failing to identify the contractual provision at issue (*see e.g.* Pl.'s 56.1 ¶ 235; Defs.' 56.1 ¶ 235), Buckley has only presented damage estimates tied to dates that precede the date of Deloitte's withdrawal (Pl.'s 56.1 ¶ 227; Defs.' 56.1 ¶ 227). Therefore, there is no evidence that any breach by withdrawal damaged Deloitte. (*See* Pl.'s 56.1 ¶ 222 (admitting that "[n]o expert has opined Deloitte's resignation was improper, or that it resulted in any damage whatsoever to DVI"); Defs.' 56.1 ¶ 222.)

---

[6] Buckley also contends that this Court should reverse its earlier decision that Pennsylvania does not recognize a breach of contract claim premised on a professional's violation of a pre-existing duty. The law has not changed, however, *see Matlack Leasing, LLC v. Morrison Cogen, LLP*, No. 09 Civ. 1570, 2010 WL 114883, at * 6 (E.D. Pa. Jan. 13, 2010), and neither has the Court's opinion. Buckley may not recover on a breach of contract claim solely on the theory that Deloitte violated GAAP or some other pre-existing professional obligation. *Buckley ex rel. DVI Liquidating Trust v. Deloitte & Touche USA LLP*, No. 06 Civ. 3291, 2007 WL 1491403, at *11 (S.D.N.Y. May 22, 2007) (citing *Foster v. Alexander & Alexander Servs.*, No. 91 Civ. 1179, 1995 U.S. Dist. LEXIS 711, at *8 (E.D. Pa. Jan. 23, 1995).

## V. Conclusion

The viability of this tort and contract action turns on Buckley's evidence of causation. The Court grants Deloitte's motion to exclude the expert report of Michael J. Epstein because it lacks factual foundation and reliable methodology. Without that evidence, Buckley must rely upon scraps of deposition testimony and declarations to demonstrate that DVI's board would have undertaken a massive and successful corporate reorganization. The evidence, however, cannot support that conclusion. Accordingly, the Court grants summary judgment in Deloitte's favor.

Dated: New York, New York
       August 16, 2012

_____
Sidney H. Stein, U.S.D.J.